# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JAY F. VERMILLION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:15-cv-00605-RLY-TAB |
| | ) | |
| MARK E. LEVENHAGEN, | ) | |
| SALLY NOWATZKE, | ) | |
| BRETT MIZE, | ) | |
| HOWARD MORTON, | ) | |
| GARY BRENNAN, | ) | |
| WILLARD PLANK, | ) | |
| DAWN BUSS, | ) | |
| CHARLES WHELAN, | ) | |
| RALPH CARRASCO, | ) | |
| | ) | |
| Defendants. | ) | |

## Entry Discussing Partial Motion for Summary Judgment

For the reasons explained below, the defendants' motion for partial summary judgment,

dkt [196], is **granted in part and denied in part.**

## I.  Introduction

This action was transferred from the Northern District of Indiana to this district following

the Seventh Circuit's Mandate issued April 6, 2015. The Mandate summarized Vermillion's claims

as follows.

> Vermillion alleges that on July 29, 2009, he was interviewed by Internal
> Affairs investigators after several fellow inmates had escaped from the Indiana
> State Prison ("ISP"). The interviewers accused him of being involved in the
> escape and threatened to pursue criminal charges, prompting Vermillion to stop
> answering their questions. Following this encounter, according to Vermillion, the
> three interviewers along with another investigator from Internal Affairs and five
> administrators from ISP, Westville Correctional Facility, and DOC headquarters
> retaliated for his silence by immediately placing him in punitive segregation at
> ISP and then on August 12, 2009, transferring him to Westville, where he was

housed in the Maximum Control Segregation Unit. This transfer, Vermillion alleges, occurred after two of the administrators falsified documents to exaggerate his security classification. All nine of these employees are named defendants.

Vermillion claims that for more than three years[1] after the transfer, he was confined in his segregation cell at Westville for at least 23 hours per day without personal interaction with other inmates, and during those years, five of the same nine employees—joined by many others—continued retaliating against him for invoking his right to remain silent. This retaliation, Vermillion alleges, ranged from intercepting his mail to mishandling the administrative hearings concerning a disciplinary ticket for trafficking contraband.

Mandate at p. 2

Vermillion argues that his transfer violated his right to due process but also was initiated for the purpose of retaliating for his refusal to answer questions about the escaped prisoners. The Fifth Amendment gives a person the right "not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973). This right applies in the prison disciplinary context, and prison officials may violate a prisoner's right against self-incrimination if a prisoner's silence alone results in punishment of the kind capable of compelling waiver of the right. *See Minnesota v. Murphy*, 465 U.S. 420, 434 (1984); *Baxter v. Palmigiano*, 425 U.S. 308, 317 (1976); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995). Although not all of his claims can be linked to his assertion of this right, Vermillion plausibly alleges that more than just the five administrators were involved in retaliating against him for his refusal to talk to the Internal Affairs investigators. Vermillion claims that his placement in punitive segregation at ISP, his transfer to the Maximum Control Segregation Unit at Westville, and the alleged falsification of documents to exaggerate his security classification and keep him confined in segregation were punishments aimed at retaliating against him because he asserted his right to silence. Because this claim points to joint conduct by the five administrators and four Internal Affairs investigators and would invariably rely on some of the same facts as his due-process claim relating to the transfer, Vermillion properly joined the defendants allegedly responsible.

Case No. 14-2327, Mandate at dkt. 87-3 at p. 5.

---

[1] The summary judgment record reflects that Vermillion was in solitary confinement for 1,513 days or more than four years.

Following the transfer of this action to this district, Vermillion was instructed to file a Third Amended Complaint. That pleading was screened and the following claims were permitted to proceed consistent with the Mandate. See dkt. 97.

> Claim 1. Willard Plank, Dawn Buss, Charles Whelan, Ralph Carrasco, Mark Levenhagen, Brett Mize, Howard Morton, Sally Nowatzke, and Gary Brennan placed Vermillion in punitive segregation at ISP, transferred him to the Maximum Control Segregation Unit (the "Westville Control Unit" or "WCU") at Westville, and confined him in segregation in retaliation for his assertion of his right to silence during an interview by internal affairs investigators.

> Claim 2. Willard Plank, Dawn Buss, Charles Whelan, Ralph Carrasco, Mark Levenhagen, Brett Mize, Howard Morton, Sally Nowatzke, and Garry Brennan placed Vermillion in the Westville Control Unit for 1,513 days in violation of his right to be free of cruel and unusual punishment.

> Claim 3. Willard Plank, Dawn Buss, Charles Whelan, Ralph Carrasco, Mark Levenhagen, and Brett Mize transferred Vermillion from the ISP to department-wide administrative segregation at the Westville Control Unit in violation of his due process rights.

> Claim 4. Howard Morton confiscated Vermillion's certified legal mail in violation of his due process and First Amendment rights.

The defendants seek summary judgment as a matter of law on all but the claim against Levehagen and Mize related to Vermillion's transfer from the ISP to department-wide administrative segregation at Westville in violation of his due process rights. See claim 3. The defendants argue that they are entitled to judgment as a matter of law as to all other claims.

Given the age of the case and the number of claims and defendants the evidentiary record is relatively sparse. In support of summary judgment, the defendants present Vermillion's deposition (including 30 pages of exhibits), a two page declaration from Charles Whelan, and an audio recording of Vermillion's July 29, 2009, interview with internal affairs officers. Vermillion opposes summary judgment. In addition to his Third Amended Complaint, which was signed under

penalty of perjury, he presents fourteen exhibits which all appear to be IDOC records.[2] The defendants replied and Vermillion submitted a surreply. The motion for summary judgment is now fully briefed.

## II. Summary Judgment Standard

A motion for summary judgment asks the court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the

_____

[2] The Seventh Circuit has held that a complaint "is the equivalent of an affidavit for summary judgment purposes" when it is verified under penalty of perjury and based on personal knowledge. *Locke v. Haessig*, 788 F.3d 662, 665 (7th Cir. 2015) (citing *Devbrow v. Gallegos,* 735 F.3d 584, 587 (7th Cir. 2013).

suit under the governing law.  *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome-determinative.  *Montgomery v. American Airlines Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the court what evidence it has that would convince a trier of fact to accept its version of the events.  *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016).  The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).  The court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them.  *Grant v. Trustees of Indiana University,* 870 F.3d 562, 573-74 (7th Cir. 2017).  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## III. Material Facts

**A. Parties**

1.      Willard Plank was, at all times relevant to the allegations made against him in the Third Amended Complaint, an employee of the Indiana Department of Correction ("IDOC"), Division of Internal Affairs as Chief Investigator. Other than his participation in the July 29, 2009, interview, Vermillion has no information regarding Plank's involvement in the circumstances at issue in this case.

2.      Dawn Buss was, at all times relevant to the allegations made against her in the Third Amended Complaint, an IDOC employee, Division of Internal Affairs as Deputy Chief. Other than her participation in the July 29, 2009, interview, Vermillion has no information regarding Dawn Buss's involvement in the circumstances at issue in this case.

3.      Charles Whelan was, at all times relevant to the allegations made against him in the Third Amended Complaint, employed by the IDOC in the Division of Internal Affairs at the ISP as Internal Affairs Officer 3. Vermillion had no interaction with Charles Whelan other than the interview.

4.      Ralph Carrasco was, at all times relevant to the allegations made against him in the Third Amended Complaint, an employee of IDOC, Division of Internal Affairs at ISP as Internal Affairs Officer 4. Vermillion's only support for a claim against Carrasco is that he prepared a conduct report charging Vermillion with a trafficking offense.

5.      Mark Levenhagen was at all times relevant to the Third Amended Complaint employed by IDOC as the Superintendent of Westville Correctional Facility.

6.     Brett Mize was, at all times relevant to the allegations made against him in the Third Amended Complaint, employed by IDOC as Director of Operations. Vermillion was told that he was placed in department-wide administrative segregation by Mize. Mize was "the one who decided whether or not you were going to be placed in this administrative segregation status." (Vermillion Dep. 42:24-43:1.)

7.     Howard Morton at all relevant times to the Third Amended Complaint was employed by the IDOC at ISP as an Administrative Assistant.

8.     Sally Nowatzke at all relevant times to the Third Amended Complaint was employed by the IDOC at Westville as a Counselor. She served as a case manager who worked in the WCU.

9.     Gary Brennan at all relevant times to the Third Amended Complaint was employed by the IDOC at Westville as an Administrative Assistant. Brennan was one of the officials who oversaw the WCU.

**B. Investigation and transfer**

1.     On July 12, 2009, Offenders Lance Battreal, Charles Smith, and Mark Booher escaped from ISP, which is located in Michigan City, Indiana.

2.     During the course of the investigation into the escape, information was received from an offender that Unit Team Counselor Don Bates and Vermillion were trafficking tobacco into ISP and that the proceeds were being stored in the law library. During a subsequent interview into the allegations of trafficking with offenders, Bates confessed to trafficking tobacco with Vermillion.

3.     Based on this information, investigators decided to interview Vermillion.

4.      On July 29, 2009, Vermillion was taken from his cell at ISP to the Internal Affairs Office, where he was interviewed by IDOC Internal Affairs Investigators Charles Whelan, Dawn Buss, and Willard Plank. The audio recording reviewed by the court reflects that the Officers wanted Vermillion to assist with their investigation and they suggest that if he cooperated he might be permitted to keep his cat in "lock up." Dkt. 200, manual filing, audio recording at 4:48. Vermillion then asks "why would I go to lock up?" *Id.* at 5:18. He is told for trafficking. *Id.* at 5:32. One of the officers goes on to say that they spoke with Bates yesterday and that "he doesn't work here any longer." *Id.* at 5:40.  Vermillion asks what that has to do with him. *Id.* at 5:41. The answer cannot be discerned from the audio, but the Officer goes on to state that they would like Vermillion to assist them because he has "a wealth of information you could help us with.  That pertains to escape, to trafficking with Bates, cell phones, tobacco three or four times a week.  We have a general idea of what's going on but we just want you to play ball with us, that's all." *Id.* at 6:04-6:24. Vermillion then told Plank "I don't think we have anything else to talk about." *Id.* at 6:44; Ver. Dep. 10:22-23. In response, Plank said "okay lock him up." Audio at 6:47.

5.      Plank then explained that Vermillion would be placed in segregation pending the investigation and the outcome would probably be a charge of trafficking with a staff member. Audio at 6:52.  In addition, if as a result of the investigation it was determined that he was involved with the escape he would be charged with aiding and abetting the escape. Audio at 7:11.

6.      Plank then asked "you got any questions?" Vermillion said "no." Audio at 7:22.

7.      Vermillion was handcuffed and taken from the interview to the disciplinary segregation unit ("IDU").

8.     On July 31, 2009, Internal Affairs Investigator Ralph Carrasco prepared a conduct report charging Vermillion with trafficking with Indiana State Prison Counselor Don Bates.  The conduct report provides in relevant part:

| Name of Offender<br>Vermillion | | Offenders DOC Number<br>973683 | Facility<br>Indiana State Prison | | Housing Unit<br>ICH |
|---|---|---|---|---|---|
| Date and time of Incident  ☑ a.m.<br>07/29/09 @  9:30        ☐ p.m. | | Place of Incident<br>ICH | | Date report written<br>07/31/09 | |
| Offense<br>Trafficking | | | | Code number<br>A113 | |
| **DESCRIPTION OF INCIDENT** (If more space is needed attach additional sheets in triplicate) | | | | | |
| On 07/29/09 at 9:30 am during an interview with Counselor Donald Bates; Mr. Bates did admit to trafficking with Offender Vermillion # 973683. Mr. Bates stated that he trafficked in tobacco and a cell phone to Vermillion. Offender Vermillion was questioned on this and declined to make a statement.<br><br>                              Reference Case Number 09-ISP-~~0173~~     _0186 ~~88~~._<br>                                                                              _8.12-09_ | | | | | |

9.     A few days later, a screening officer met with Vermillion and provided him with a screening report indicating that he was under investigation for trafficking with staff. Vermillion was also provided a Segregation/Confinement Report which informed him that he was being placed in segregation pending investigation for trafficking with staff. Dkt. 208-1.[3]

10.    Prior to his confinement in segregation, Vermillion worked in the law library. Following the internal affairs interview, a search of the law library uncovered $12,000 in cash and four pounds of tobacco.

---

[3] The defendants note that Mr. Bates pled guilty to trafficking as a Class C Felony under Indiana Code § 35-44-3-9. *State of Indiana v. Donald Bates*, 46D02-1004-FC-000022, docket sheet available online at mycase.in.gov. The docket sheet reflects that Mr. Bates' sentence was suspended and served as probation. After probation was successfully completed, the charge was converted to a Class A Misdemeanor.

11.     Trafficking in money and tobacco is a security risk to the orderly operation of a prison facility. Segregating an offender involved in trafficking is a means of disrupting a trafficking network.

12.     Whelan testified that Vermillion was placed in segregation pending the outcome of the investigation into trafficking, and not because he refused to answer questions during his interview. Any offender involved in trafficking would be placed in segregation and Vermillion was not treated any differently.

13.     Vermillion was confined in the IDU from July 29 to August 12, 2009.

14.     On August 12, 2009, Vermillion was found guilty of trafficking and transferred from ISP to the Westville Control Unit or WCU. He was sentenced to one year in disciplinary segregation, lost 30 days of earned good time credit and was demoted from Credit Earning Class I to Credit Earning Class II. Dkt 209 at 5. Vermillion's trafficking conviction was vacated for rehearing three times.[4] The Seventh Circuit's Order which remanded Vermillion's petition for a writ of habeas corpus in *Vermillion v. Superintendent,* 3:12-cv-150-PPS, was decided years after this civil rights action was initiated. That Order discusses the fact that Vermillion was not given notice of the charge alleged against him. *See Vermillion v. Mark E. Levenhagen*, Case No. 12-2436 (7th Cir. March 26, 2013) (nonprecedential disposition) (attached to this Entry). On February 13, 2014, however, instead of conducting a fourth hearing of the trafficking charge, Vermillion's

---

[4] See *Vermillion v. Superintendent,* Cause No. 3:10-cv-119-PPS (N.D. Ind. March 16, 2011), *Vermillion v. Superintendent* 3:11-cv-123-TLS (N.D. Ind. October 24, 2011), *Vermillion v. Superintendent* 3:12-cv-150-PPS (N.D. Ind. 2012). All filed in the Northern District of Indiana and attacking Vermillion's trafficking conviction.

trafficking charge of July 29, 2009, was dismissed and the entire matter was expunged from his record. Dkt. 208 at ¶ 58.

15.     Vermillion repeatedly argues that he should never have been found guilty of trafficking because on July 29, 2009, he was being interviewed by internal affairs and not available for trafficking. There is no doubt the conduct report was flawed. The conduct reports lists, for the date of offense, the date when the prison counselor confessed that he and Vermillion trafficked. The Seventh Circuit noted that "The only incident date appearing in this record is July 29, and the prison does not contend that it ever believed that this date was correct." *Vermillion,* No. 12-2436 at p. 4. The conduct report does not reflect that on that date and time Vermillion was actively involved in trafficking. Dkt. 208-1 at p. 2. It is for this reason that the anticipated testimony of ISP Officers Sabinski, McCormack and Walker and ISP Disciplinary Hearing Board Chairman Bessie Leonard is insufficient to create a material fact in dispute. These individuals were expected to testify that it was not possible for Vermillion to have been trafficking with staff in I-Cellhouse at the exact date and time he was being interrogated by Internal Affairs Investigators. There is no dispute that Vermillion was not trafficking on July 29, 2009.

16.     On or about August 12, 2009, WCU case counselor Sally Nowatzke and WCU Director of Operations Gary Brennan falsified information and documentation to increase Vermillion's security classification designation so that he could be housed at the super max facility.

17.     Vermillion testified that from August 12, 2009, he was placed in C-Pod where psychotic, out-of-control, and unmanageable inmates are housed. For the next three and a half years he was subjected to the following conditions. Dkt. 208 at p. 7.

a. complete isolation in a solid concrete cell with a solid steel door for 23-24 hours a day;

b. no direct contact or interaction with others;

c. extreme cold;

d. constant strobe-lighting;

e. cell-flooding;

f. mace fumes;

g. people threatening to and actually committing suicide;

h. no actual recreation;

i. no telephone use (for two and a half years);

j. no work, income, or educational opportunities;

k. no religious services;

l. no hot water;

m. cold meals;

n. regular cell ransacking; and

o. humiliating strip-searches.

18.     In October of 2009, Vermillion met with Doug Barnes who informed him that he was being placed on department-wide administrative segregation per Brett Mize.[5]

19.     Howard Morton's only involvement in this lawsuit was with regard to Vermillion's legal mail. Vermillion wrote letters and hand-drafted affidavits for Sergeant Sabinski, Officer Springfield, and Officer Day. Vermillion wanted the Sergeant and Officers to sign affidavits in

---

[5] There is no indication that this classification changed Vermillion's physical placement or the conditions of his confinement listed above at paragraph number 17.

support of his appeal from his prison disciplinary conviction for trafficking. Howard Morton sent Vermillion two letters informing Vermillion that he received the letters and that IDOC staff would not be signing affidavits for Vermillion. Sergeant Sabinski, Officer Springfield, and Officer Day were not Vermillion's attorneys, but were employees of the Indiana Department of Correction. The letters reflect the following:

| | |
|---|---|
| **TO:** | Jay Vermillion, DOC 973683 |
| | Westville Control Unit |
| **FROM:** | Howard Morton, Executive Assistant |
| **RE:** | Affidavits for Staff |
| **DATE:** | October 16, 2009 |

This is to acknowledge receipt of your correspondence sent to Sgt. Day and Officer Springfield. After checking with DOC Legal, staff will not be signing any affidavit for you. I am returning all documents you have sent to the Indiana State Prison regarding this issue.

HM:pj

cc: SP 973683
    File

Dkt. 196-1 at 136.

TO:         Jay Vermillion, DOC 973683
            Westville Control Unit

FROM:       Howard Morton, Executive Assistant

RE:         Certified Mail for Sgt. Karen Sabinski

DATE:       September 29, 2009


This is to acknowledge receipt of your certified mail sent to Sgt. Karen Sabinski. This
mail was accepted by accident. We are returning the mail unopened because Ms. Sabinski
is no longer employed with the Department of Correction.

HM:pj

cc: SP 973683
    File

This letter was located in *Vermillion v. Superintendent*, 3:10-cv-119-PPS, at dkt 1-1.

20.     Vermillion is now back in general population. (Ver. Dep. 50:16-19.)

21.     Spending 1,513 days on an ergonomically incorrect mat, in a painfully cold cell,
and without access to a chair caused Vermillion spinal problems. In addition, being placed in
solitary confinement under harsh conditions without due process and based on a conduct report
that was ultimately expunged caused him mental, emotional and psychological injury.

### IV. Discussion

**A. Retaliation**

Vermillion's first claim is that Willard Plank, Dawn Buss, Charles Whelan, Ralph
Carrasco, Mark Levenhagen, Brett Mize, Howard Morton, Sally Nowatzke, and Gary Brennan
placed Vermillion in punitive segregation at ISP, transferred him to the Maximum Control

Segregation Unit (the "WCU") at Westville, and confined him in segregation in retaliation for his assertion of his right to silence during an interview by internal affairs investigators. Dkt. 97, p. 2. For the reasons explained below, the defendants are entitled to summary judgment on this claim.

As a preliminary matter, Vermillion argues that the Seventh Circuit's "decree of March 5, 2015," decided that the evidence was sufficient to support his claim of retaliation and that this ruling is binding in all subsequent proceedings, including the instant summary judgment proceedings. Dkt. 209 at p. 5. Vermillion is mistaken. The standard for surviving a motion to dismiss is different from the summary judgment standard set forth above. The fact that plausible claims were identified based solely on accepting the allegations in the complaint as true, is not the same as a finding that there is evidence to support those claims for purpose of summary judgment. Thus the Seventh Circuit's opinion is not evidence that can be used for the purposes of defeating summary judgment, just as this court's entry cannot be used as evidence to support either party at a future trial.

To prevail on his First Amendment retaliation claim, a plaintiff must show that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009); *see Mays v. Springborn*, 719 F.3d 631, 635 (7th Cir. 2013); *Devbrow v. Gallegos*, 735 F.3d 584, 588 (7th Cir. 2013) ("Retaliation requires a showing that the plaintiff's conduct was a motivating factor in defendant's conduct.").

There is no dispute that Vermillion engaged in protected activity when he refused to provide information to assist internal affairs with the investigation into trafficking and other

prisoners' escapes. The Fifth Amendment gives a person the right "not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973). This right applies in the prison disciplinary context, and prison officials may violate a prisoner's right against self-incrimination if a prisoner's silence alone results in punishment of the kind capable of compelling waiver of the right. *See Minnesota v. Murphy*, 465 U.S. 420, 434 (1984); *Baxter v. Palmigiano*, 425 U.S. 308, 317 (1976); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995).

There is also no dispute that Vermillion suffered deprivations that would likely deter First Amendment activity in the future. For example, he was placed in punitive segregation at ISP; he was transferred to WCU, and he was kept in solitary confinement for more than four years.

Retaliation also requires a showing that the plaintiff's conduct was a motivating factor in the defendants' conduct. Mere speculation is insufficient to meet this burden. *Devbrow v. Gallegos,* 735 F.3d 584, 588 (7th Cir. 2013). A defendant can prevail if he shows that the offending action would have happened even if there had been no retaliatory motive, i.e., the alleged harm would have occurred anyway. *Mays v. Springborn,* 719 F.3d 631, 634-35 (7th Cir. 2013). If defendants meet this burden, Vermillion must then show that the defendants' proffered reason is pretextual, that is, a lie. *Thayer v. Chiczewski*, 705 F.3d 237, 250 (7th Cir. 2012).

The defendants are entitled to summary judgment as to all of Vermillion's retaliation claims because no reasonable fact finder could conclude that Vermillion's refusal to answer questions about other prisoner's escapes on July 29, 2009, was a motivating factor in any defendant's decision to take retaliatory action.

The audio recording of the interview with internal affairs reflects that Vermillion was told that he was going to lock up for trafficking before he was asked to "play ball" and assist with the investigation. Vermillion then told Plank "I don't think we have anything else to talk about," and Plank then said "okay lock him up." Audio at 6:44. Plank then explained that Vermillion would be placed in segregation pending the investigation and the outcome would probably be a charge of trafficking with a staff member. Audio at 6:52. In addition, if as a result of the investigation it was determined that Vermillion was involved with the escape he would be charged with aiding and abetting the escape. Audio at 7:11.

The adverse actions taken against Vermillion were all based on the investigation into trafficking. Internal Affairs Officer Whelan testified that another offender reported to internal affairs that then Unit Team Counselor Don Bates and Vermillion were trafficking tobacco into ISP and that the proceeds from the trafficking were being stored in the law library. Bates also confessed to trafficking tobacco with Vermillion. Searches were conducted at ISP that uncovered approximately $12,000 in cash hidden in the law library and four pounds of tobacco. Vermillion was treated like any other offender believed to be involved with trafficking in that he was placed in segregation.

Vermillion disagrees with this conclusion arguing that he has alleged a chronology of events from which retaliation may plausibly be inferred. In particular, Vermillion argues that immediately after he asserted his right to terminate the internal affair's interview he was placed in solitary confinement in the facility's punitive segregation unit. He argues that the conduct report was issued as a pretext to justify his segregation.

As explained above, however, the decision to send Vermillion to "lock up" was made prior to Vermillion stating that he was done talking to the internal affairs officers. In addition, his placement in segregation was a result of the trafficking investigation. Vermillion goes on to claim that he was charged with an offense that could not have occurred; that is, trafficking with Counselor Don Bates in I-Cellhouse at 9:30 a.m. on July 29, 2009, which is the exact date and time he was being interrogated by defendants Plank, Buss, and Whelan. Vermillion is correct that the conduct report was poorly written and ambiguous, but that does not negate the fact that internal affairs conducted an investigation into Vermillion trafficking tobacco with Bates and that internal affairs concluded after locating thousands of dollars in the law library that trafficking had occurred. Accepting the record in the light most favorable to Vermillion, it is possible that he was not involved in trafficking, but the undisputed evidence is that the internal affairs officers believed he was. In addition, the undisputed facts show that Vermillion was segregated as a result of an investigation showing evidence of ongoing trafficking, and not because he was believed to be trafficking in the Internal Affairs office on July 29, 2009 at 9:30 a.m. Under these circumstances the deficient conduct report does not establish that the explanation for his segregation was a pretext.

Finally, there is no evidence to support the assertion that defendants were motivated to deny Vermillion due process during the disciplinary proceedings because he refused to assist the internal affairs investigation. Vermillion argues that a number of IDOC employees would testify that they were instructed to take actions with respect to Vermillion in retaliation for his invocation, or they "understood" he was placed in the WCU in retaliation for refusing to answer questions concerning the July 12, 2009, escape of three men from ISP. See dkt. 194. But this testimony, even

if accepted as true for purposes of summary judgment, it is insufficient to create a material fact in dispute because the testimony does not include any reference to the individual defendants or how the individual defendants were involved in retaliating against Vermillion. Instead, this anticipated testimony appears to show that certain non-parties were aware of or participating in retaliation. Hearsay statements are insufficient to survive summary judgment.

The IDOC's due process failures and Vermillion's extended placement in solitary confinement are problematic for the reasons discussed below, but there is no evidence that retaliation was a motivating factor.

No reasonable trier of fact could conclude that that the adverse actions Vermillion faced were the result of the defendants' retaliating against him for exercising his Fifth Amendment rights. Accordingly, the defendants are entitled to judgment as a matter of law on the retaliation claim.

## B.    Conditions of Confinement at Westville Control Unit

Vermillion next claims that Willard Plank, Dawn Buss, Charles Whelan, Ralph Carrasco, Mark Levenhagen, Brett Mize, Howard Morton, Sally Nowatzke, and Gary Brennan placed Vermillion in the Westville Control Unit for 1,513 days in violation of his Eighth Amendment right to be free of cruel and unusual punishment. See dkt. 97, pp. 2-3. For the reasons explained below, Willard Plank, Dawn Buss, Charles Whelan, Ralph Carrasco, and Howard Morton are entitled to summary judgment because they lack personal involvement in the conditions of confinement Vermillion faced in the WCU. Meanwhile, the Eighth Amendment claim shall proceed as to Mark Levenhagen, Brett Mize, Sally Nowatzke and Gary Brennan.

In *Isby v. Brown*, 856 F.3d 508 (7th Cir. 2017), the Seventh Circuit explained that in order to prevail on a conditions of confinement claim,

> two elements are required to establish a violation of the Eighth Amendment's prohibition against cruel and unusual punishment: first, an objective showing that the conditions are sufficiently serious—i.e., that they deny the inmate "the minimal civilized measure of life's necessities," *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), creating an excessive risk to the inmate's health and safety—and second, a subjective showing of a defendant's culpable state of mind. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). We have held that "prolonged confinement in administrative segregation may constitute a violation of the Eighth Amendment ... depending on the duration and nature of the segregation and whether there were feasible alternatives to that confinement." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 666 (7th Cir. 2012) (citing *Walker v. Shansky*, 28 F.3d 666, 673 (7th Cir. 1994)); *see also Meriwether v. Faulkner*, 821 F.2d 408, 416 (7th Cir. 1987).

*Id.* at 521.

The defendants do not provide any evidence as to the conditions of confinement Vermillion faced in the WCU. Instead, they argue that Vermillion has failed to articulate a singular, legally cognizable human need of which he has been deprived. The defendants point out that the Seventh Circuit has held that "[i]nactivity, lack of companionship and a low level of intellectual stimulation do not constitute cruel and unusual punishment even if they continue for an indefinite period of time." *Isby v. Brown*, 856 F.3d 508, 522 (2017) (quoting *Bono v. Saxbe*, 620 F.2d 609, 612 - 614 (7th Cir. 1980)). They further argue that given the "extensive case law rejecting Eighth Amendment claims based upon" conditions of confinement like those found at the Westville Control Unit, "[w]ithout some egregious deprivation … complaints about the conditions of confinement fall short." *Isby*, 856 F.3d 508, 522 (7th Cir. 2017) (holding that the district court did not err in rejecting an Eighth Amendment challenge to the conditions of confinement in the Special Confinement Unit at the Wabash Valley Correctional Facility).

Vermillion testified that for more than four years he was subjected to complete isolation in a solid concrete cell with a solid steel door for 23-24 hours a day with no direct contact or interaction with others. While in his cell he was exposed to extreme cold, constant strobe-lighting, cell-flooding, mace fumes, people threatening to and actually committing suicide, no actual recreation, no telephone use (for two and a half years), no work, income, or educational opportunities, no religious services, no hot water, cold meals, regular cell ransacking, and humiliating strip-searches. Unlike the plaintiff in *Isby* there is no suggestion that Vermillion's failure to cooperate was the reason he remained in the WCU. In addition, unlike the plaintiff in *Isby,* there is no basis in the record to conclude that Vermillion was a security threat beyond the fact that he had been investigated for trafficking with an officer. Vermillion attached Executive Directive #09-07 dated January 21, 2009 (effective date February 15, 2009). This directive and the disciplinary appeal for case number ISP 09-08-0006 reflect that the disciplinary segregation time associated with the trafficking conviction (which was later expunged) was limited to 30 days on October 8, 2009. Dkt. 208-1 at 6. These facts suggest that "there were feasible alternatives to that confinement." *Isby*, 856 F.3d at 521.

Under these circumstances, the defendants request to find that there was no sufficiently serious deprivation must be denied. Similarly, the claim that Vermillion has not alleged an injury sufficient to survive summary judgment is rejected. He testified that the cold caused him pain, the deprivation of human contact associated with solitary confinement caused him psychological injury, and that the accommodations injured his back. Dkt. 209 at p. 27. See *Hutto v. Finney,* 437 U.S. 678, 686-87 (1978) ("[T]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards."); *Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring) (discussing "[t]he human toll wrought by extended terms of isolation"

*Id.* at 2209) (citing *Grassian, Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y 325 (2006) (common side-effects of solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors)).

Next, the defendants argue that several defendants lack the requisite personal involvement such that there is no evidence that suggests they had the necessary culpable state of mind. Plank, Buss, and Whelan were involved in Vermillion's interview and the investigation into trafficking, but there is no evidence that they were involved in any of the events that transpired after he was initially placed in segregation after leaving the Internal Affairs office. As for Carrasco, he drafted the conduct report, but Vermillion has no information about what Carrasco did after that or any information showing that he was involved in any of the events that would transpire after he left the Indiana State Prison.

A defendant can be held liable under Section 1983 only for deprivations that he or she personally caused, either by direct action or by approval of the conduct of others – vicarious liability cannot support a Section 1983 claim. *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978). *Moore v. State of Indiana*, 999 F.2d 1125, 1129 (7th Cir. 1993) (liability under Section 1983 must be based on personal responsibility, not respondeat superior). In order to be held responsible for the violation of a federally secured right pursuant to 42 U.S.C. § 1983, an individual must have personally participated in the alleged constitutional violation. *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000) (*citing Starzenski v. City of Elkhart*, 87 F.3d 872, 879 (7th Cir.1996)). Accordingly, Plank, Buss, Whelan, Carrasco and Morton are entitled to judgment as a matter of law on the Eighth Amendment claim based on the conditions of confinement Vermillion faced in WCU.

As to the remaining defendants, Superintendent Levenhagen, Sally Nowatzke, Brett Mize and Gary Brennan, the claims against them shall proceed as submitted. Vermillion argues that these defendants had to have known of the risks inherent to long-term solitary confinement but deliberately subjected Vermillion to those conditions for more than three years such that a jury could conclude they possessed the sufficiently culpable state of mind. Dkt. 209 at p. 28. In the absence of any evidence from the defendants to contradict this claim, Vermillion's argument is accepted. Each of these defendants knew or should have known that Vermillion had been placed in solitary confinement for over four years under conditions readily apparent.

In particular, Vermillion testified that Nowatzke and Brennan were responsible for changing/falsifying Vermillion's security classification so that he would remain in the WCU. Brennan was also responsible for confiscating of Vermillion's television and the destruction of Vermillion's personnel effects which impacted the conditions of Vermillion's confinement and is conduct consistent with deliberate indifference. In addition, given the nature of the undisputed conditions in the WCU, Superintendent Levenhagen and Brett Mize, the officer who placed Vermillion on department-wide administrative segregation status in the WCU as the IDOC Director of Operations, should have known of the conditions Vermillion faced and were the individuals in the best position to correct the problems. "A defendant will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent." *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001).

Summary judgment on the Eighth Amendment conditions of confinement claim based on Vermillion's placement in solitary confinement for 1,513 days in the WCU is denied as to

Defendants Brennan, Nowatzke, Levenhagen and Mize.

## C. Transfer to Department-Wide Administrative Segregation

Vermillion alleges that Plank, Buss, Whelan, Carrasco, Levenhagen, and Mize, transferred him from the Indiana State Prison to department-wide administrative segregation at WCU in violation of his due process rights. There is no dispute that Vermillion did not have a liberty interest in avoiding a transfer to Westville. However, inmates transferred to a "supermax" prison are entitled to informal, non-adversarial due process. *Wilkinson v. Austin,* 545 U.S. 209, 229-29 (2005) (describing supermax facilities "as maximum-security prisons with highly restrictive conditions, designed to segregate the most dangerous prisoners from the general prison population." *Id.* at 213). This informal due process requires "'some notice' of the reasons for the inmate's placement . . . and enough time to 'prepare adequately' for the administrative review." *Westefer v. Neal*, 682 F.3d 679, 684 (7th Cir. 2012). This informal review procedure need only take place within a 'reasonable time' of the inmate's transfer to the supermax facility. *Id.* The Supreme Court has held that when an inmate is transferred to administrative segregation, he must have:

> an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.

*Hewitt v. Helms*, 459 U.S. 460, 476 (1983) (quoted by *Westefer*, 682 F.3d at 685). No written decision describing the reasons for an inmate's placement or appeal procedure is required. However, a periodic review of the placement determination is required. *Id. See also Littler v.*

*Indiana Dep't of Corr. Com'r, No.* 3:11-CV-218 CAN, 2013 WL 4551072, at *1 (N.D. Ind. Aug. 28, 2013) (discussing available damages when IDOC agreed constitutionally required due process hearing was denied prior to placement in department-wide administrative segregation unit).

Vermillion argues that because the defendants have not argued or offered any evidence that they complied with the requirements of *Wilkerson* and *Westefer* and Vermillion has testified that he was not given due process, a reasonable factfinder could conclude that the defendants violated his due process rights. In particular, defendants Levehagen and Mize do not seek summary judgment as to this claim. These defendants are allegedly responsible for Vermillion's transfer from the ISP to department-wide administrative segregation in the WCU at Westville in violation of his due process rights. The due process claim against defendants Levehagen and Mize shall proceed.

Willard Plank, Dawn Buss, Charles Whelan, and Ralph Carrasco do seek summary judgment on this claim. These defendants were involved in Vermillion's original placement in segregation, but there is no evidence they were involved in Vermillion's placement in department-wide administrative segregation which was a decision made by Mize and approved by Levenhagen. Accordingly, they are entitled to summary judgment on the due process claim.

**D. Certified Mail Seeking Affidavits**

Vermillion's final claim for relief is that defendant Morton confiscated three pieces of certified legal mail in violation of Vermillion's due process and First Amendment rights. Vermillion explains that the mail included a cover letter, proposed affidavit of staff witnesses and a self-addressed stamped envelope. Morton intercepted this mail and in a letter dated October 16, 2009, advised Vermillion that, after consulting with IDOC's legal staff, no employees would be signing affidavits for him.

The letters were directed toward Vermillion's administrative appeal of his prison disciplinary sanction. The letters requested that three staff members sign affidavits. Sgt. Sabinski was asked to testify to the fact that on Wednesday, July 29, 2009, at 8:40 a.m., he escorted Vermillion to the Internal Affairs office and that Vermillion never returned to I-Cellhouse. Sgt. Springfield was asked to testify that on Wednesday, July 29, 2009, at 8:40 a.m. he witnessed Sgt. Sabinski escort Vermillion to the Internal Affairs office and that Vermillion did not return to I-Cellhouse. Dkt. 196-1 at 125. Sgt. Day was asked to testify to the fact that Vermillion's August 12, 2009, disciplinary hearing was conducted by only one hearing officer. Dkt. 196-1 at 127.

These letters including the affidavits were not entitled to any special protection. "Inmates have a First Amendment right both to send and receive mail, but that right does not preclude prison officials from examining mail to ensure that it does not contain contraband." *Kaufman v. McCaughtry*, 419 F.3d 678, 685 (7th Cir. 2005). Vermillion's rights were not violated when Howard Morton reviewed mail sent by Vermillion to employees of the Department of Correction who were not his attorneys and responded that IDOC staff would not sign his affidavits. In addition, Vermillion was not injured by the confiscation of these letters. The content reflects that he intended to use them to challenge his trafficking conviction. That conviction was ultimately expunged. Under these circumstances, Vermillion was not injured by Morton's confiscation of the letters nor was he denied access to court. Had the disciplinary hearing process worked properly (it did not), the proper manner for Vermillion to receive the testimony he sought was by requesting witnesses statements.

Morton is entitled to summary judgment on this claim.

### V. Conclusion

The defendants' motion for summary judgment, dkt [196], is **granted in part and denied in part.**

Defendants Howard Morton, Willard Plank, Dawn Buss, Charles Whelan, and Ralph Carrasco are entitled to judgment as a matter of law as to all claims alleged against them. The **clerk is directed** to terminate these five defendants on the docket.

All defendants are entitled to summary judgment on the retaliation claim.

Summary Judgment is denied as to the claim that Mark Levenhagen, Sally Nowatzke, Brett Mize and Gary Brennan violated Vermillion's Eighth Amendment rights through his placement in the Westville Control Unit for 1,513 days.

Summary Judgment is denied as to the claim that Mark Levenhagen and Brett Mize transferred Vermillion from the ISP to department-wide administrative segregation at the Westville Control Unit in violation of Vermillion's due process rights.

No partial final judgment shall issue at this time as to the claims resolved in this Entry.

**IT IS SO ORDERED.**

5/22/2018

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distribution:

JAY F. VERMILLION
973683
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

David C. Dickmeyer
INDIANA ATTORNEY GENERAL
David.Dickmeyer@atg.in.gov

Benjamin Myron Lane Jones
INDIANA ATTORNEY GENERAL
benjamin.jones@atg.in.gov