UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JAY F. VERMILLION, | ) |
| Plaintiff, | ) ) ) |
| v. | )  Civil Action No. 1:15-cv-605-RLY-TAB |
| MARK E. LEVENHAGEN, | ) ) ) |
| Superintendent, *et al*., | ) ) |
| Defendants. | ) |

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE EXPERT
WITNESS ROBERT MORGAN**

Defendants' response in opposition to Plaintiff's motion to exclude Dr. Robert Morgan from testifying fails to reckon with serious flaws in Dr. Morgan's methods that Plaintiff has exposed.  It is Defendants' burden to demonstrate the admissibility of Dr. Morgan's testimony. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).  Yet Defendants fail to defend many of Dr. Morgan's methodological errors, and they offer no evidence or argument that Dr. Morgan is qualified to challenge Plaintiff's correctional expert, Dan Pacholke, on correctional industry standards.  Such "wholesale failure to respond to an opposing argument results in waiver."  *Citizens for Appropriate Rural Roads v. Foxx*, 14 F. Supp. 3d 1217, 1230 (S.D. Ind. 2014) (citing *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010); *United States v. Farris*, 532 F.3d 615, 619 (7th Cir. 2008)).  Dr. Morgan's testimony should be excluded.

## ARGUMENT

### 1. Defendants Do Not Explain How Dr. Morgan's Background Qualifies Him to Opine on the Issues in this Case.

In assessing expert qualifications, the relevant question is "not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for [him] to answer a specific question." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (internal quotation marks and citation omitted). Defendants spill much ink describing Dr. Morgan's general credentials as a forensic psychologist, but offer very little as to his qualifications to opine about the effects of segregation in the Indiana Department of Correction. *See* Def's Response Br., Doc. No. 324 at 2–5. Defendants cite Dr. Morgan's experience performing mental health evaluations for criminal defendants, his work with the Lubbock Regional Mental Health Retardation Center, and his testimony in criminal cases as to competency matters and criminal risk assessments.[1] *Id.* at 4. This generalized experience working with criminal defendants does not qualify him to opine as to the matters at hand. Defendants also rely on Dr. Morgan's professional experience working with men in solitary confinement in Kansas, yet this portion of Dr. Morgan's career spanned less than two years and occurred nearly 25 years ago. *Id.* at 3–4. Defendants tout Dr. Morgan's "95 publications," of which only one publication—his flawed meta-analysis—pertains to the effects of solitary confinement on prisoners. *Id.* at 3.

Defendants contend that Dr. Morgan is "qualified to serve as an expert witness as to the mental health issues faced by incarcerated offenders" and "as an expert witness as to the mental health issues faced by offenders housed in segregation." *Id.* at 4–5. Dr. Morgan cannot possibly

---

[1] Defendants note that Dr. Morgan has provided expert testimony in Alabama, California, Kansas, Missouri, Oklahoma, Texas, and in Canada. Doc. No. 324 at 4. The cited portion of Dr. Morgan's report makes clear that he is referencing testimony in state courts. *See* Morgan Report, Doc. No. 312-1 at 6. Dr. Morgan has never been qualified as an expert in federal court. Morgan Depo. (Ex. 1) at 76:12–14.

2

testify as to general mental health issues faced by people in prison.  Whatever generalized views Dr. Morgan may have on the mental health issues of the incarcerated, his testimony on that subject would be far afield from the issues in this case.  Moreover, without direct information concerning the conditions in segregation in the Indiana Department of Correction—and the Westville Control Unit in particular—Dr. Morgan has no basis to connect his (very limited and temporally remote) exposure to solitary confinement units elsewhere to those at issue here.

Finally, whatever his qualifications in the mental health field, it is clear that Dr. Morgan is not an expert in correctional practices and is not qualified to testify as to correctional industry standards.  *See* Pl's Br. in Support of Mot. to Exclude, Doc. No. 312, Section III.C at 32–33.  Plaintiff presented this argument in his opening brief, *id.*, and Defendants have not responded to it.  "Failure to respond to an argument . . . results in waiver."  *Bonte*, 624 F.3d at 466.  In any event, it is Defendants' burden to demonstrate the admissibility of their expert's opinions, *Lewis*, 561 F.3d at 705, and Defendants have not even attempted to carry that burden.  Therefore, Dr. Morgan should be barred from commenting on correctional expert Dan Pacholke's opinions as to relevant correctional industry standards.

## 2. Dr. Morgan's Testimony Lacks a Reliable Foundation Because He Did Not Evaluate Plaintiff.

Defendants stumble in their attempt to minimize the damage of Dr. Morgan's not having evaluated Mr. Vermillion.  *See* Doc. No. 324 at 2.  Defendants do not contend that Plaintiff's counsel limited their mental health expert's access to Mr. Vermillion, nor do they contradict Dr. Morgan's testimony that his decision not to examine Mr. Vermillion was one of time management.  *Compare* Doc. No. 312 at 6 *with* Doc. No. 324 at 2.  Defendants also make no argument that the mental health record in this case provides a sufficient basis for Dr. Morgan to

testify as to Mr. Vermillion's mental health.  *See* Doc. No. 324 at 5-7.  Plainly, it does not. Morgan Depo., Doc. No. 312-4 at 83:5–9.

Instead, Defendants pledge that Dr. Morgan will not testify about the effects of segregation on Mr. Vermillion, Doc. No. 324 at 2, the implied reason being Dr. Morgan's concession that without evaluating Mr. Vermillion this testimony would lack basis.  *See* Doc. No. 312-4 at 83:5–9 (affirming that "a mental health professional has to evaluate someone to reach a conclusion as to their mental health); *id.* at 83:10–13 (acknowledging that in his forensic practice he would only testify as to a criminal defendant's competency after evaluating her). Nonetheless, Defendants proffer Dr. Morgan's opinions about Mr. Vermillion's character and mental health under the guise of critiquing Dr. Kupers.  This attempted end-run should not be permitted.  *See Castrillon v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 2015 WL 3448947 at *4 (S.D. Ind. May 29, 2015) (barring psychology expert's diagnosis of defendant because expert "conceded . . . he cannot make such a diagnosis, having never met [the defendant]").

Despite Dr. Morgan's caveats and their own, Defendants' response brief seeks to have Dr. Morgan testify regarding Mr. Vermillion's mental health as follows:

- Mr. Vermillion's "post hoc diagnosis is belied by Jay Vermillion's mental health records from the time he was in segregation."  Doc. No. 324 at 5.
- "Mr. Vermillion's incentive to deceive for financial gain" provides "a basis for suspecting over-reporting of symptoms. . . ."  *Id.* at 7.
- Mr. Vermillion's "history of exhibiting an antisocial personality disorder (i.e. a condition marked by a pervasive pattern of disregard for and violation of the rights of others . . . as indicated by at least three symptoms, including deceitfulness)" indicates potential malingering.  *Id.*

4

Dr. Morgan should be barred from giving such testimony given his own acknowledgment that without examining Mr. Vermillion, he lacks a basis to opine as to Mr. Vermillion's mental health.[2]

### 3. Defendants' Additional Arguments in Support of Dr. Morgan's Malingering Testimony Are Unpersuasive.

Dr. Morgan's failure to examine Mr. Vermillion obviously bars any testimony as to malingering. In addition to all the reasons listed in the preceding section, there are still further reasons to exclude Dr. Morgan's testimony on this point. *See* Doc. No. 312 at 12–14.

Dr. Morgan would testify that: (1) every civil litigant has a strong motive to lie to her mental health examiner, and (2) therefore must be presumed malingering until "cleared" by psychological testing. Morgan Report, Doc. No. 312-1 at 12–13[3]; Doc. No. 312-4 at 83:21–25; Morgan Depo. (Ex. 1) at 113:24–14:2, 116:1–6. Dr. Morgan supports the first part of this opinion by citing the Heilbrun study for the proposition that "the majority of persons (67%) assessed in a forensic context distorted their presentations in response to external motivations (e.g., financial gain . . .)." Doc. No. 312-1 at 12. Plaintiff's brief demonstrated that Dr. Morgan severely misinterprets and misrepresents the findings of the Heilbrun study, thereby drastically overemphasizing the role that symptom exaggeration plays in forensic evaluations. Doc. No. 312 at 12–13 (explaining the very different context of the Heilbrun study, the lack of financial incentive at issue, and that only 9% of responses indicated malingering). Defendants do not defend Dr. Morgan's stunning misuse of the Heilbrun study. *See Bonte*, 624 F.3d at 466. Instead, they argue that Plaintiff has not revealed the flaws in *all* of the studies Dr. Morgan cites, just *some*. Doc. No. 324 at 6. But exclusion of expert testimony does not require the systematic

---

[2] *See also* Doc. No. 312 at 9–10 (describing practice guidelines for forensic psychologists and importance of a clinical interview).
[3] Page citations to Dr. Morgan's expert report, Doc. No. 312-1, refer to the cm/ecf page numbers.

dismantling of every parenthetical source.  Plaintiff analyzed the primary source Dr. Morgan relied upon for his opinion that malingering was so prevalent in response to financial gain (prevalent in a *majority* of cases), that psychological testing must be done in every civil case. *See* Doc. No. 312-1 at 14.  Plaintiff's analysis shows that Dr. Morgan's data and method of interpretation is unreliable, and exclusion is appropriate.

Plaintiff has also shown that the second prong of this opinion lacks support.  Doc. No. 312 at 13-14.  Plaintiff analyzed Dr. Morgan's reliance on the Melton forensic handbook because Dr. Morgan cites Melton as support for his conclusion that "tests specially designed to detect malingering should be a routine part of forensic practice."  Doc. No. 312-1 at 14.  But the Melton handbook does not come to that conclusion, instead identifying the clinical interview as the most common and venerable technique for discerning malingering and suggesting testing only when there is a basis to suspect malingering—*not* in every forensic case.  Doc. No. 312 at 14.

Defendants offer no response to Plaintiff's argument that Dr. Morgan is not qualified to opine as to the standard of practice for a psychiatric forensic evaluation (such as the one Dr. Kupers performed), because he is not a psychiatrist, and because he testified that he does not know the standard of practice for a psychiatric forensic evaluation.  *See id.*  Rather than address the pertinent question of Dr. Morgan's basis for testifying, Defendants employ a diversion. Defendants attack Plaintiff's expert, arguing that Plaintiff "provides no explanation of what should be considered the standard of practice," Doc. No. 324 at 7, and "acknowledges, by omission, that Dr. Kupers' evaluation of Plaintiff fails to meet the acknowledged practice standards in the field."  *Id.* at 6.  The reliability of Dr. Kupers' opinions is manifestly not the subject of Plaintiff's motion to exclude Dr. Morgan and is an improper subject for Defendants'

6

response brief. Defendants' failure to respond to Plaintiff's argument should be construed as waiver. *Bonte*, 624 F.3d at 466.

### 4. Dr. Morgan Should Not be Permitted to Testify that Dr. Kupers Has Confirmation Bias.

Plaintiff seeks to exclude proposed testimony that Dr. Kupers failed to rule out confirmation bias, because Dr. Morgan did not explain what Dr. Kupers should have done to rule out bias to Dr. Morgan's satisfaction. Doc. No. 312 at 15–16. Plaintiff argued that without this explanation Dr. Morgan was not grounding his opinion in scientific expertise. *Id.* Such testimony does not help the jury and instead invades its role to weigh credibility. *Id.*

Defendants still cannot explain what Dr. Kupers should have done to rule out confirmation bias. *See* Doc. No 324 at 8. Choosing not to respond directly to Plaintiff's argument, Defendants criticize Plaintiff for "gloss[ing] over this section of Dr. Morgan's report." *Id.* However, this section of Dr. Morgan's report is itself only five sentences, Doc. No. 312-1 at 15, and its lack of substance is the very point of Plaintiff's challenge. *See Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 at n.6 (7th Cir. 1998) ("Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions."). Defendants suggest that clearly established case law giving juries the role of weighing witness credibility does not apply to expert opinion testimony. *See* Doc. No. 312 at 16 & Doc. No. 324 at 8. But they offer no explanation for why juries should have the role of weighing the credibility of all witnesses except those testifying as experts. *See id.* Instead, Defendants insist that Dr. Morgan should be able to label Dr. Kupers' views as "extreme" based on testimony he gave in another matter. *Id.* For these reasons, Dr. Morgan should be barred from testifying as to Dr. Kupers' purported confirmation bias.

### 5. Defendants Do Not Respond to Plaintiff's Argument that Dr. Morgan Should Not Be Permitted to Testify as to Preexisting Factors.

The court should also bar Dr. Morgan's proposed testimony as to Dr. Kupers' supposed failure to consider preexisting factors when evaluating Mr. Vermillion's current mental health presentation. Doc. No. 312 at 15–16. Plaintiff showed that Dr. Morgan's proposed testimony lacks support, because Dr. Morgan did not personally examine Mr. Vermillion, and because Dr. Morgan admits he cannot testify to standards for forensic psychiatrists. *Id.* at 16. Defendants failed to respond to this argument in their responsive briefing, *Bonte*, 624 F.3d at 466, even though it is their burden to demonstrate the admissibility of Dr. Morgan's opinions. *Lewis*, 561 F.3d at 705. For this reason, and for those given in Plaintiff's opening brief, this testimony should be excluded.

### 6. Dr. Morgan Should Not Be Permitted to Testify as to the Effects of Solitary Confinement Because of the Unreliability of His Supporting Data.

Dr. Morgan's meta-analysis shapes his views on the effects of solitary confinement. Doc. No. 312-1 at 11. But that meta-analysis is unreliable, as are Dr. Morgan's methods of interpreting it. Doc. No. 312 at 19–32. Faced with Plaintiff's explanation of these flaws, Defendants provide a lukewarm defense and several key concessions.

Defendants acknowledge Plaintiff's criticism of Dr. Morgan's interpretation of the results of his meta-analysis. Doc. No. 324 at 12 n.1 (citing Doc. No. 312-1 at 12–13). In fact, as Plaintiff explained in his motion, Doc. No. 312 at 28, Dr. Morgan's use of the meta-analysis to compare the effects of solitary confinement to the effects of general incarceration is a "methodological disaster." Dr. Morgan's approach improperly mixed comparators (*i.e.*, general incarceration vs. life outside prison). *Id.* at 27–28. Dr. Morgan claimed to compare the effects of solitary confinement to "general incarceration," but actually compared those effects to a single

1990 study of the effects of prison overcrowding. *Id.* at 29–30. And Dr. Morgan's conclusion that the health effects of solitary confinement are comparable to the health effects of general incarceration is based on a study showing the precise opposite to be true. *Id.* at 30–31.

Defendants offer no defense to these challenges, noting only that Dr. Morgan conceded to errors during his deposition. Doc. No. 324 at 12 n.1. *See Bonte*, 624 F.3d at 466 (failure to respond to an argument constitutes waiver); *Lewis*, 561 F.3d at 705 (proponent of expert testimony has burden of demonstrating admissibility). Defendants argue that precluding Dr. Morgan from testifying as to these opinions should not preclude him from testifying to other opinions. *Id.* But Defendants do not explain how the court should decide which portions of Dr. Morgan's opinions are tainted by his methodological errors and which survive. *See id.* Reviewing Dr. Morgan's report demonstrates that his opinions as to the magnitude of the harms of solitary confinement rely on his erroneous interpretation of the literature, as filtered through his meta-analysis. On pages 11 and 12 of his report,[4] Dr. Morgan extolls the virtues of meta-analysis for providing a "collective" look at the literature on solitary confinement. Doc. No. 312-1 at 12. On page 13,[5] he explains that this "collective" view of the literature demonstrates that negative consequences associated with solitary confinement are not universal, that some prisoners in solitary will actually improve, and that the effects of solitary confinement are on average mild to moderate and comparable to the effects of general incarceration. *Id.* at 13. Dr. Morgan's flawed methods therefore infect his central opinion and are not severable from it. Accordingly, Dr. Morgan should be excluded from testifying as to the harms of solitary confinement.

---

[4] These page citations refer to the cm/ecf page numbers. The original page numbers for Dr. Morgan's report are 9 and 10.
[5] This page citation also refers to the cm/ecf page number. The original page number for Dr. Morgan's report is 11.

9

Defendants do offer a defense to Plaintiff's arguments as to the unreliability of the meta-analysis itself and Dr. Morgan's favored source, the Colorado Study. Doc. No. 324 at 10–12. But Defendants' response is unconvincing.

The meta-analysis is an unreliable collection of the research on solitary confinement, because it fails to include the vast majority of solitary confinement scholarship, and because the studies on which it relies are themselves unreliable and not comparable to the solitary confinement at issue in this case. *See* Doc. No. 312 at 19–27. Defendants contend that Plaintiff has not explained why the meta-analysis's limitation on studies was "artificial," "why it matters if it was," or "why that in any way makes the research unreliable." Doc. No. 324 at 10. To the contrary, Plaintiff explained that there exists a vast body of robust literature on the effects of solitary confinement and that Dr. Morgan ignored this research in his purported attempt at "collecting" the relevant literature. Doc. No. 312 at 19–21. Further, many of the studies Dr. Morgan did include in his meta-analysis have little to do with the question of psychological harm, instead addressing subjects such as medical outcome, recidivism and institutional misconduct. *Id.* at 21. Therefore, Dr. Morgan's meta-analysis is predicated on a non-representative sample of the research documenting the harms of solitary confinement and is unreliable as a source. *Id.*

Finally, Defendants' defense of the Colorado Study is unavailing. Defendants cite Dr. Morgan's testimony defending his heavy reliance on the Colorado Study. Doc. No. 324 at 11. Dr. Morgan acknowledges cross-contamination of the control group and treatment group. *See id.* Yet he claims that the contamination was *irrelevant*, because the researchers found that the results for the participants who had cross-exposure were similar to the results for participants who did not have cross-exposure. *Id.* This contention is simply bizarre. Cross-contamination is

10

the point.  The data for cross-contaminated participants can only be deemed invalid.  Dr. Morgan's willingness to ignore the contamination of the Colorado Study cannot be forgiven out of deference to his expert credentials, because Dr. Morgan admits he is not an expert in design and execution of controlled studies.  Doc. No. 312-4 at 134:22–24.

Defendants also cite the primary author of the Colorado Study's defense of her study's reliance on prisoners' self-scoring tests.  Doc. No. 324 at 11–12.  But Defendants miss the point of Plaintiff's argument.  The problem with the Colorado Study's reliance on self-scoring tests is that it used *only* those tests, and *excluded* medical records, staff reports, and clinical interviews.  Doc. No. 312 at 23–24.

Defendants also fail to address the third problem with Dr. Morgan's overreliance on the flawed Colorado Study: there are differences between solitary confinement as practiced in Colorado and as practiced in Indiana.  *See id.* at 24–25.  Thus, at least one court has found that Colorado's unique program of affording privileges to those in solitary confinement so differentiates that program as to make it an improper comparator.  *See id.* at 24 n. 8; *and see generally State Farm Fire & Cas. Co. v. Electrolux Home Products*, 980 F. Supp. 2d 1031, 1049 (N.D. Ind. 2013) ("When conducting a comparative analysis, to meet the reliability that *Daubert* demands, an expert must select samples that are truly comparable . . . . care must be taken to be sure that the comparison is one between 'apples and apples' rather than one between 'apples and oranges.'") (citations omitted).[6]

Plaintiff's challenges to Dr. Morgan's other sources also go unanswered.  *See* Doc. No. 312 at 25–27 (citing major attrition problems that invalidate the Zinger study; challenging

---

[6] Defendants point out that Dr. Morgan's meta-analysis (though not his extrapolations from it) and the results of the Colorado Study were published and peer-reviewed.  Doc. No. 324 at 10–11.  These factors are not dispositive as to admissibility, *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 594 (1993), and are plainly insufficient in light of the unreliability of these sources demonstrated here.

11

inclusion of the Zinger study and two other studies because participants volunteered for solitary confinement and the studies were of such short duration as to be incomparable; explaining that another study lacked a general population control group).

Defendants argue generally that Plaintiff's challenge to Dr. Morgan reveals no more than disagreement among professionals.  Doc. No. 324 at 12.  Not so.  Federal Rule of Evidence 702 and the *Daubert* line of cases call upon the court to keep out expert testimony that lacks sufficient grounding in facts and data and is the product of unreliable methods.  Those fundamental problems are in issue here.  The court should exercise its gatekeeping function and exclude Dr. Morgan.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Exclude Expert Witness Robert Morgan from Testifying should be granted.

By: */s/ Maggie Filler*
Maggie Filler (pro hac vice)
RODERICK AND SOLANGE
MACARTHUR JUSTICE CENTER
745 Atlantic Avenue, 8th Floor
Boston, MA 02111
Phone: (857) 284-1455
Fax: (857) 284-8049
maggie.filler@macarthurjustice.org

12

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2019, the foregoing was filed using the Court's CM/ECF electronic filing system. Copies of the filed documents will be electronically sent to all counsel of record in the CM/ECF system.

*/s/ Maggie Filler*
Maggie Filler (pro hac vice)
RODERICK AND SOLANGE
MACARTHUR JUSTICE CENTER
745 Atlantic Avenue, 8th Floor
Boston, MA 02111
Phone: (857) 284-1455
Fax: (857) 284-8049
maggie.filler@macarthurjustice.org